❒ Original ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>Information associated with Apple iCloud account ("TARGET ACCOUNT"), as further described in Attachment A, that is stored at premises controlled by Apple | ) | Case No. 26-818M(NJ)<br>Matter No. 2025R00353 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the __________ District of __________
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 1/26/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 11/24/2026.

Date and time issued: 1/12/2026 @ 2:16p.m.

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Apple ID and Apple iCloud account associated with the following information ("**TARGET ACCOUNT**"), that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

- Phone: 414-294-9815 (**Target Cell Phone 2**)
- Name: Miguel A. Gonzalez
- Date of birth: 11/19/1995

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by Apple Inc. ("Apple")

To the extent that the information described in Attachments A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, Apple is required to disclose the following information to the government for each account or identifier listed in Attachments A:

a. All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the accounts were created, the length of service, the IP address used to register the accounts, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the accounts (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all emails associated with the accounts from January 1, 2025 to the present, including stored or preserved copies of emails sent to and from the accounts (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d. The contents of all instant messages associated with the accounts from September 1, 2024 to the present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the accounts (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f. All activity, connection, and transactional logs for the accounts (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g. All records and information regarding locations where the accounts or devices associated with the accounts were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h. All records pertaining to the types of service used;

i. All records pertaining to communications between Apple and any person regarding the accounts, including contacts with support services and records of actions taken; and

j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, those violations involving **Miguel GONZALEZ** and others known and unknown, and occurring after January 1, 2025 to the present, including, for each account or identifier listed on Attachments A, information pertaining to the following matters:

(a) The sale, distribution, and possession with intent to distribute controlled substances, and launder the proceeds of drug trafficking;

(b) A conspiracy to distribute and possess with the intent to distribute controlled substances, including the existence, scope, acts in furtherance, and members of the conspiracy;

(c) Evidence about the source, sale, procurement, processing, manufacturing, shipping, or distribution of controlled substances, including customer lists, supplier lists, shipping information, and payments;

(d) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(e) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(g) The identity of the person(s) who communicated with the user ID about matters relating to drug trafficking, including records that help reveal their whereabouts.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with Apple iCloud account ("TARGET ACCOUNT"), as further described in Attachment A, that is stored at premises controlled by Apple

Case No. 26-818M(NJ)

Matter No. 2025R00353

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ____________ District of ____________________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1),843(b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Conspiracy to Distribute a Controlled Substance & Use of a Communication Facility in Furtherance of Drug Trafficking Crime. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 11/24/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JOSEPH L ESQUEDA Digitally signed by JOSEPH L ESQUEDA Date: 2026.01.09 10:43:39 -06'00'

*Applicant's signature*

Joseph Esqueda, HSI TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/12/2026

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joseph ESQUEDA, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information from the iCloud account associated with the following cellular number **414-294-9815** and used by Miguel A. GONZALEZ, Date of Birth 11/19/1995 ("**TARGET ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B. 414-294-9815 is also referred to herein as **Target Cell Phone 2.**

2. I am Police Officer with the Milwaukee Police Department (WI) and a Federally Deputized Task Force Officer with Homeland Security Investigations ("HSI") assigned to the Homeland Security Task Force ("HSTF"). I am also assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Interdiction Initiative as a drug detection K9 handler and partnered with K9 "GHOST." I have been employed as a full-time law enforcement officer for over twenty (20) years.

3. As Police Officer and Task Force Officer, I have participated in the investigation of gang and narcotics related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. As an investigator, I have interviewed many individuals involved in drug trafficking and gang activity, and have obtained information from them about the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the drug traffickers, gang members, and abusers of controlled substances. I have participated in all aspects of drug and gang investigations, including physical surveillance, execution of search warrants, court-ordered wiretaps, analysis of phone and financial records, and the arrests of drug traffickers. I have also been the affiant and participated in the preparation and execution of drug and gang-related search warrants. Additionally, I have spoken with other experienced drug investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers and gang members to manufacture, smuggle, safeguard, and distribute narcotics and firearms, and to collect and launder trafficking-derived proceeds. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

4. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code,

Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

5. As a part of my duties, I investigate criminal violations relating to narcotics trafficking offenses, including violations of Title 21, United States Code, Sections 841, 843, and 846, and federal firearms offenses, including violations of Title 18, United States Code, Sections 922(g), 924(a), and 924(c). In the course of my experience, I have and continue to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang investigations, organized crime, violent crime, firearms offenses, drug trafficking, including cellular telephones and other electronic telecommunication devices.

6. I have had formal training in the investigation of drug trafficking. I have worked with informants in the investigation of drug trafficking. I have participated in the execution of numerous search warrants in which controlled substances, firearms, drug paraphernalia, and monies were seized.

7. This affidavit is based upon my personal knowledge and upon information provided to me by other federal, state, and local law enforcement officers during the course of their official duties. Throughout this affidavit, I refer to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

8. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1), 843(b), and 846 ("Target Offenses") have been committed by **Miguel GONZALEZ ("GONZALEZ")** and others known and unknown. There is also probable cause to search the information described in Attachments A for evidence and instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

10. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### Seized Parcels

11. On Tuesday, September 30, 2025, Wisconsin State Patrol Trooper Gareth Sedgebeer-Williams and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Robert Gregory responded to a private parcel carrier for random parcel screening. Case agents located two different parcels that were addressed to Thomas Baker of 3021 West Auer Avenue, Milwaukee, Wisconsin. The parcels were sent from Glenair INC of 1211 Air Way, Glendale, California, 91201. Case agents were unable to find a "Thomas Baker" residing at 3021 West Auer Avenue and believed it to be a fake alias.

12. Trooper Sedgebeer-Williams deployed his trained controlled substance detection K9 (Smoky) on the parcels and Smoky gave a final indication to the odor of controlled substances coming from the parcels. Trooper Sedgebeer-Williams composed a State of Wisconsin search

warrant to search the contents of the parcels.

13. Upon the warrants being granted, case agents located approximately 20 pounds of crystal methamphetamine in each parcel (40 pounds of crystal methamphetamine total).

14. Also on September 30, 2025, law enforcement executed a controlled delivery of the seized parcels. The crystal methamphetamine was removed from the parcels and they were filled with "sham," (a substance that is not a controlled substance). An undercover Milwaukee Police Officer delivered both parcels to 3021 West Auer Avenue and placed them on the ground in front of the door. Officers observed a male, later identified as Brandin S. FOUNTAINE (DOB XX/XX/1986), walk to 3021 West Auer Avenue. FOUNTAINE observed both parcels and he ran back to 3002 West Burleigh Street. FOUNTAINE then drove out of 3002 West Burleigh Street in a black pick up truck. FOUNTAINE drove directly to 3021 West Auer Avenue and placed both parcels in the bed of his pick up truck. After FOUNTAINE obtained the parcels, law enforcement conducted a traffic stop of the vehicle and FOUNTAINE was detained.

15. A *Mirandized* Interview was conducted of FOUNTAINE. FOUNTAINE stated that he rents a space within 3021 West Burleigh Street to fix automobiles, but also conducts maintenance work at 3002 West Burleigh Street and 3021 West Auer Avenue. FOUNTAINE stated he was walking his dog when he observed the two parcels at 3021 West Auer Avenue. FOUNTAINE later obtained the parcels and was going to bring them back to 3002 West Burleigh Street and put them in a common area where all delivered parcels go to. FOUNTAINE denied knowing what was inside of the parcels. FOUNTAINE gave officers consent to download and inspect the contents of his cell phone. FOUNTAINE was later released.

16. Case agents reviewed the data on FOUNTAINE's cell phone. On September 30, 2025, at approximately 10:39AM, FOUNTAINE was texting with "Babezzz" (608-421-4960).

FOUNTAINE stated, “The package still isn’t here. We are down the block waiting for it me and the Mexican.”. With this message being on the same day as the controlled delivery, case agents believe that FOUNTAINE lied to law enforcement and was in fact involved in obtaining the parcels that previously contained crystal methamphetamine.

17. Case agents also found a text message string with Target Cell Phone 1 within FOUNTAINE’s cell phone. As it will be explained later in this affidavit, case agents found Target Cell Phone 1 to be utilized by Miguel A. GONZALEZ (DOB 11/19/1995).[1] The contact name was “Twitch” in FOUNTAINE’s cell phone. Case agents conducted a check of CashApp for Target Cell Phone 1 and found the CashApp account to be: “Miguel Gonzalez $74sendittt”. On June 19, 2025, at approximately 11:46PM, Target Cell Phone 1 (believed to be GONZALEZ) texted FOUNTAINE, “Tell primo I need him active by 8am” and “Get a little rest” and “Its important”. Case agents subpoenaed records from the private parcel company from which the two methamphetamine-laden parcels came. Case agents requested a comprehensive list of all parcels that were sent by Glen Air INC from January 1, 2025 to October 7, 2025. Case agents searched for all parcels that were delivered on June 20, 2025. Case agents found that a parcel was delivered to 3100 West Concordia Avenue, Milwaukee, Wisconsin, 53216. 3100 West Concordia Avenue is one block north and one block west of 3021 West Auer Avenue.

18. Based on the text message sent by Target Cell Phone 1 (believed to be GONZALEZ) to FOUNTAINE, along with the delivery of the parcel, case agents believe that GONZALEZ was telling FOUNTAINE that a parcel was being delivered and that he (FOUNTAINE) and “Primo” would be needed to pick up the parcel.

## Confidential Source Information

### Confidential Source 1

19. In October of 2025, case agents were made aware of a confidential source (CS 1) that had information related to this investigation. On Tuesday, October 30, 2025, case agents met with CS 1. CS 1 stated that in July or August of 2023, CS 1 met Anthony M. MITCHEM (white male 01/23/1980) while incarcerated. Case agents showed CS 1 a photograph of MITCHEM and CS 1 positively identified MITCHEM. While in custody, CS 1 and MITCHEM spoke about crystal methamphetamine trafficking. In January of 2024, after being released from custody, MITCHEM called CS 1 about CS 1 obtaining crystal methamphetamine from MITCHEM. That same day, CS 1 drove to Milwaukee and met with MITCHEM at a gas station. CS 1 bought 1 pound of crystal methamphetamine from MITCHEM for $3,000. CS 1 estimated that he purchased anywhere between 3 to 5 pounds of crystal methamphetamine from MITCHEM.

20. While CS 1 was dealing with MITCHEM, MITCHEM introduced CS 1 to MITCHEM's uncle. CS 1 did not know this individual's real name. From case agents' knowledge of this investigation, case agents believed the uncle to be a subject herein referred to as Confidential Source 2 (CS 2). Case agents showed CS 1 a photograph of CS 2 and CS 1 identified CS 2 as CS 1's crystal methamphetamine supplier.

21. According to CS 1: In May or June of 2024, CS 1 was released from a drug treatment program and CS 1 received a phone call from CS 2. They spoke about the sales of crystal methamphetamine and CS 1 agreed to begin buying crystal methamphetamine from CS 2. Shortly thereafter, CS 1 would travel to Milwaukee once a week to purchase crystal methamphetamine from CS 2.

22. According to CS 1: If CS 1 arrived in Milwaukee during the day, CS 1 would meet CS 2 at a factory building CS 2 managed. From case agents' knowledge of this investigation, case agents knew that CS 2 was associated with 3002 West Burleigh Street. Case agents showed CS 1 a Google Maps photograph of 3002 West Burleigh Street and CS 1 positively identified this as the building where CS 1 would meet CS 2 to purchase the crystal methamphetamine. 3002 West Burleigh Street is the building in which Brandin FOUNTAINE attempted to bring two parcels that previously contained crystal methamphetamine before being detained by law enforcement.

23. CS 1 stated that CS 1 would arrive at the location and CS 2 would open the gate for CS 1 to drive in. CS 1 would drive to a parked camper or RV and stay in the vehicle. CS 2 would go inside of the camper or RV to obtain the crystal methamphetamine. The transaction would occur and CS 1 would immediately leave.

24. Through their criminal relationship, CS 1 estimated that CS 1 purchased one pound of crystal methamphetamine from CS 2 on approximately 20 different occasions. CS 1 purchased five pound quantities on approximately 4 difference occasions. In total, CS 1 stated that CS 1 purchased 40 to 50 pounds of crystal methamphetamine from CS 2. CS 1 further stated that the crystal methamphetamine that CS 1 was arrested with was purchased from CS 2.

25. Beginning in October of 2025, CS 1, made statements against CS 1's penal interest. CS 1 has the following criminal convictions: burglary, operating a vehicle without owner's consent, attempt disarming of a police officer, felony bail jumping, possession with the intent to deliver marijuana, felon in possession of a firearm, possession of controlled substances, and possession with the intent to deliver amphetamine. CS 1 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin. CS 1 has not been promised consideration for providing law enforcement with information on on-going criminal

activity. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by seizures of physical evidence. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

**Confidential Source 2**

26. Case agents found that CS 2 was currently in custody. Case agents met with CS 2 on two different who provided case agents with information related to this investigation.

27. The following information was derived from an in person debrief of CS 2 in November of 2025. CS 2 stated that in March or April of 2025, CS 2 rented out a portion of a warehouse building located on North 30th Street and West Burleigh Street. TFO Gregory showed CS 2 a photograph of 3002 West Burleigh Street and CS 2 positively identified this as the building in which CS 2 rented a space. 3002 West Burleigh Street is the warehouse building in which FOUNTAINE was bringing the seized crystal methamphetamine parcels to before he was stopped by law enforcement on September 30, 2025. Case agents showed CS 2 a photograph of FOUNTAINE and CS 2 positively identified FOUNTAINE. CS 2 stated that the building is owned by Frank MITCHEM. CS 2 has known Frank MITCHEM CS 2's whole life and considers Frank MITCHEM as a nephew. CS 2's space inside the building was the rear West corner and CS 2 paid Frank Mitchem $1,500 per month. CS 2 was able to give officers the name of other individuals that rented space within the building: "Cuba", individuals from Venezuela, "Brett", "Marco", and "Miguel".

28. CS 2 also knew "Miguel" as "Bobby." CS 2 stated that "Miguel" was CS 2's crystal methamphetamine supplier. TFO Gregory showed CS 2 a Wisconsin Department of

Transportation (WI DOT) photograph of GONZALEZ and CS 2 positively identified GONZALEZ as CS 2's crystal methamphetamine supplier. CS 2 stated that GONZALEZ's personal phone number started with "807." Case agents knows that GONZALEZ's phone number is 414-807-0753 (Target Cell Phone 1). According to CS 2, GONZALEZ would use other phones that he utilized for controlled substance trafficking and would change phones/phone numbers every month. CS 2 stated that GONZALEZ lives with his child's mother near the area of South 23rd Street and West National Avenue. Case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street. This registered address corroborates CS 2's information. Through law enforcement databases, case agents found that GONZALEZ is romantically involved with Anatalia L. RODRIGUEZ (DOB XX/XX/1989). RODRIGUEZ's WI DOT registered address is also 738 South 23rd Street.

29. CS 2 had known GONZALEZ for approximately four years before GONZALEZ had moved into 3002 West Burleigh Street. Shortly after moving into the warehouse, GONZALEZ approached CS 2 and began to ask about CS 2's open federal case. CS 2 assured GONZALEZ that CS 2 was not cooperating with law enforcement and GONZALEZ inquired with CS 2 if CS 2 knew of individuals that wished to purchase crystal methamphetamine. CS 2 in fact did have associates of Asian descent that wished to purchase crystal methamphetamine. CS 2 knew these individuals as "Asian Boy" and "Fire Boy." CS 2 believed that "Asian Boy" and "Fire Boy" were crystal methamphetamine users and street level traffickers that sold the crystal methamphetamine in a "tent city" near North 32nd Street and West Cherry Street.

30. CS 2 then began to fill orders for these individuals through GONZALEZ. For about a month, CS 2 would obtain an ounce of crystal methamphetamine from GONZALEZ and then sell the crystal methamphetamine to the buyers. CS 2 would sell the crystal methamphetamine for

$200 and would make $100 of the transaction. Every time that CS 2 would order the crystal methamphetamine from GONZALEZ, GONZALEZ would leave 3002 West Burleigh Street and come back with the crystal methamphetamine shortly thereafter. This made CS 2 believe that GONZALEZ has a stash location nearby. CS 2 further stated that sometimes FOUNTAINE would go and get the crystal methamphetamine and bring it to 3002 West Burleigh Street.

31. The transactions amounts increased from ounces, to multiple ounces, to then even half pounds and full pounds of crystal methamphetamine. CS 2 would sell a half pound of crystal methamphetamine for $1,250 to $1,300 and a full pound for $2,000 to $2,500. CS 2 estimated that CS 2 sold "Asian Boy" and "Fire Boy" 10 to 20 pounds of crystal methamphetamine. All of this crystal methamphetamine was obtained by CS 2 from GONZALEZ.

32. CS 2 was arrested operating a vehicle while intoxicated prior to the seizure of the two methamphetamine-laden parcels discussed above. CS 2 stated that last crystal methamphetamine transaction CS 2 made with "Asian Boy" and "Fire Boy" was one week before CS 2 was arrested and CS 2 sold them one pound of crystal methamphetamine that CS 2 obtained from GONZALEZ.

33. CS 2 stated that CS 2's nephew, Anthony MITCHEM, introduced CS 2 to another crystal methamphetamine trafficker, CS 1. Case agents showed CS 2 a WI DOT photograph of Anthony MITCHEM and CS 2 positively identified Anthony MITCHEM as CS 2's nephew. Through case agents' knowledge of this investigation, case agents know this to be CS 1. Case agents showed CS 2 a WI DOT photograph of CS 1 and CS 2 positively identified the individual. CS 2 knew that CS 1 was from the Fox Valley area. CS 1 would travel to the Milwaukee area and purchase crystal methamphetamine from CS 2. CS 2 would meet CS 1 in a number of different areas: Potawatomi, 3002 West Burleigh Street, or other areas in Milwaukee. CS 2 further stated

that CS 2 knew CS 1 was arrested by police while in possession of crystal methamphetamine. CS 2 stated that days prior to CS 1 being arrested, CS 2 sold CS 1 two pounds of crystal methamphetamine that CS 2 received from GONZALEZ. CS 2 estimated that CS 2 sold crystal methamphetamine to CS 1 on 10 to 15 occasions. All of the crystal methamphetamine sold by CS 2 to CS 1 was supplied by GONZALEZ.

34. CS 2 was then asked how GONZALEZ was obtaining the crystal methamphetamine. CS 2 had first-hand knowledge that GONZALEZ would receive the crystal methamphetamine through the mail from California. CS 2 did not know the company utilized to send the parcels. GONZALEZ would use different addresses to have the parcels sent to. GONZALEZ would commonly have more than one parcel sent at a time. The total sum of the parcels ranged from 20 to 50 pounds. CS 2 estimated that GONZALEZ would receive a shipment once a month or every six weeks. CS 2 stated that if there were two parcels coming to Milwaukee, GONZALEZ would go to one location while FOUNTAINE would go to the other.

35. CS 2 recalled a parcel delivery in the summertime of 2025. CS 2 was present for the delivery and believed it to be in the area of North 47th Street or North 49th Street by West Hampton Avenue. CS 2 remembers the house was by a McDonalds by West Hampton Avenue. Case agents reviewed a map of the area and found a McDonalds on the South West corner of North 49th Street and West Hampton Avenue. CS 2 knows that GONZALEZ has a family member in the area and GONZALEZ picked an abandoned house in the area to have the parcel sent to. GONZALEZ obtained the package after it was delivered and opened it in front of CS 2. CS 2 stated that the parcel was filled with packing peanuts and there were numerous saran wrapped bundles that each contained one pound of crystal methamphetamine. CS 2 estimated there was 10

pounds of crystal methamphetamine in the parcel. This packaging style is the same in which case agents encountered in the two seized parcels from September 30, 2025.

36. CS 2 stated that GONZALEZ would take frequent trips to California in order to pay his crystal methamphetamine supplier. CS 2 further stated that the supplier would commonly come to Milwaukee and GONZALEZ would have to entertain the individual. When the supplier would come to Milwaukee, GONZALEZ would be frantically collecting money from customers in order to pay the supplier.

37. Investigators conducted a review of Wisconsin Department of Corrections recorded jail call system, ICSOULTIONS, for Target Cell Phone 1. Since CS 2 has been in custody, CS 2 has been in contact with GONZALEZ on Target Cell Phone 1 on seven different occasions between 10/17/2025 and 11/11/2025.

38. Beginning in 2024, CS 2 made statements against CS 2's penal interest's concerning CS 2's federal drug indictment. CS 2 was released from custody and not revoked on CS 2's state supervision despite the federal charges to allow CS 2 to cooperate with law enforcement. CS 2 provided cooperation to federal agents until CS 2 was arrested for operating under the influence and held in custody. CS 2's cooperation included at least one controlled buy of controlled substances and CS 2 providing information concerning drug traffickers in the Milwaukee area. CS 2's information regarding these drug traffickers was credible and, in some cases, independently corroborated by law enforcement. Further, CS 2 provided location information on a wanted subject that led to that person's arrest. However, during that time, and against CS 2's cooperation agreement, CS 2 became involved in selling methamphetamine to CS 1 and others as recounted above. When confronted with this by case agents following CS 2's arrest, CS 2 admitted to CS 2's conduct and made further statements against CS 2's penal interest

concerning CS 2's trafficking of methamphetamine while CS 2 was actively cooperating with law enforcement. Case agents believe that when CS 2 was confronted with case agents' knowledge about CS 2's methamphetamine trafficking CS 2 provided a truthful statement regarding CS 2's involvement in methamphetamine sales. It is possible, however, that CS 2 was involved in *other* unlawful or deceptive conduct while CS 2 was cooperating with law enforcement, and that law enforcement has not yet learned of this additional unlawful or deceptive conduct. On balance, because case agents have corroborated a significant amount of information provided by CS 2 concerning GONZALEZ and CS 2's connection to GONZALEZ, they believe CS 2's information concerning GONZALEZ is accurate and reliable. CS 2 has the following criminal convictions: recklessly endangering safety, burglary, felony bail jumping, escape, possession with the intent to deliver cocaine, and felon in possession of a firearm. CS 2 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin and state charges of OWI (1st w/ Passenger < 16 Yrs Old), Operating w/ PAC-Passenger < 16 Yrs, PAC>=0.08, <0.15 (1st), and Neglecting a Child (No Harm and Child < 6 Yrs or Disability). CS 2 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 2 concerning the investigation into RODRIGUEZ has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

39. Case agents went to the area where CS 2 reported the "tent city" and located several caravans/RVs parked in an area consistent with CS 2's information.

40. Separately, the Drug Enforcement Administration (DEA) conducted a controlled buy operation using CS 3 in the same general area near 32nd Street in Milwaukee, Wisconsin. In sum, within the last 30 days, DEA conducted two controlled buys of crystal methamphetamine from a male of Asian descent (Kue LEE (DOB XX/XX/1981)). The methamphetamine purchased during each operation is believed to be supplied to LEE by GONZALEZ.

41. For several reasons, case agents believe CS 3's information is reliable and that CS 3 is credible. Substantial parts of CS 3's information has been independently corroborated and verified by law enforcement. CS 3 has made direct observations, which were further corroborated and verified by law enforcement. CS 3's information has been consistent with information obtained from telephone toll records, social media records, public databases, and surveillance. CS 3 has also provided information to the Brown County Drug Task Force and the Marinette County Sheriff's Department, which has been verified by law enforcement. CS 3 has prior convictions for theft, possession of controlled substances, battery, and manufacture or deliver controlled substances. CS 3 is cooperating for consideration on open cases for drug-related offenses. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable.

42. On November 19, 2025, Waukesha County Drug Task Force (WCDTF) confidential source (herein CS 3) purchased approximately 472.9 gross grams of suspected methamphetamine, approximately 91.2 gross grams of suspected Fentanyl, and approximately 55.4 gross grams of suspected fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

43. On November 19, 2025, TFO Kopatich and SA Kazamias met with CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances,

with negative results. After the search, TFO Kopatich provided CS 3 with a quantity of Officially Advanced Funds (OAF). Additionally, CS 3 was provided with a live feed audio/video recording device and recording a device was placed in CS 3's vehicle. CS 3 was contacted by LEE and informed that LEE was staying at the Holiday Inn Express. CS 3 was kept under constant surveillance and drove towards the Holiday Inn Express, located at 525 N. Jefferson Street, Milwaukee, Wisconsin. CS 3 parked CS 3's near the Holiday Inn Express and subsequently entered room number 202. LEE and an unidentified female (hereafter referred to as UFM1) were in room 202. While in room 202, CS 3 provided LEE with the buy money for the purchase of the controlled substances as witnessed by TFO Kopatich via live video feed.

44. CS 3, LEE, and UFM1 exited the hotel room, and subsequently entered CS 3's vehicle and departed the area. It should be noted that CS 3 was under constant surveillance as CS 3, LEE, and UFM1 travelled to a residence located at 320 N. 32nd Street, Milwaukee, Wisconsin. CS 3, LEE, and UFM1, parked behind 320 N. 32nd Street, and exited the vehicle. Subsequently, they proceeded to enter a gated area where there was a shed and camper. CS 3 entered the camper. Shortly thereafter, LEE went into a shed near the camper. At one point, CS 3 exited the camper in order to open the gate for three middle-aged Asian males who met with LEE in the shed while CS 3 went back into the camper. A short time later, the three Asian males left after which LEE provided the suspected purple fentanyl to CS 3. During a post operational debrief with CS 3, CS 3 stated that the three Asian males were the ones who delivered the purple fentanyl to LEE. CS 3 further reported that CS 3 has seen the same males deliver the fentanyl to LEE in the past prior to LEE providing the fentanyl to CS 3.While inside the camper, CS 3 waited for the delivery of controlled substances with multiple unidentified individuals, believed to have been customers.

45. TFO Loftus observed a gray Honda Odyssey bearing WI Registration BCD5755 (subject vehicle) arrive at 21st and St. Paul in Milwaukee, Wisconsin. Shortly thereafter, TFO Loftus observed LEE enter the Odyssey (subject vehicle) and depart the area. A Wisconsin Department of Transportation check of the Odyssey (subject vehicle) lists the vehicle to a Rehab Better Home LLC, with a listed address of 155 E. Johnson Street, Fond Du Lac, WI, 54935. Shortly after meeting with the occupant(s) in the Odyssey (subject vehicle), LEE returned to the camper. CS 3 exited the camper, entered CS 3's vehicle, and departed the area. CS 3 was kept under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location. While at the predetermined meet location, TFO Kopatich retrieved four quantities of suspected controlled substances from CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results.

46. Case agents conducted a post-operational debrief with CS 3. During the debrief, CS 3 stated that LEE met with the methamphetamine source of supply in a van (which, in context, I believe to be the subject vehicle) in the area of N. 31st Street and St. Paul Avenue, the same location where TFO Loftus observed LEE entering the Honda Odyssey (subject vehicle). CS 3 stated that CS 3 believed the methamphetamine source of supply to be a Hispanic male. CS 3 stated that LEE returned to the camper with a small box containing two individually wrapped pounds of methamphetamine. According to CS 3, LEE removed one of the pounds to be divided amongst the waiting customers while LEE gave CS 3 the box containing the other pound. CS 3 also stated that LEE had provided CS 3 with the purple fentanyl as well as a small bag of white fentanyl. The CS also stated that an unidentified subject gave CS 3 a quantity of suspected marijuana. CS 3 stated that prior to leaving, LEE told CS 3 that CS 3 owed LEE $1,400 to be paid at a later time.

47. Case agents reviewed Wisconsin Department of Financial Institutions (WIDFI) records for "Rehab Better Home LLC" and learned that the Registered Agent is Miguel A. GONZALEZ and the principal office is listed as 738 S. 23rd Street, Milwaukee, Wisconsin 53204. As detailed above, case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street. Based on my training and experience, the information provided by CS 1, CS 2, and CS 3, the observations made during the controlled buy with CS 3, and the WIDOT and WIDFI records, I believe that GONZALEZ (or someone operating on GONZALEZ's behalf) delivered two pounds of methamphetamine to LEE inside the Odyssey (subject vehicle).

48. On December 9, 2025, WCDTF CS 3 purchased approximately 260.2 gross grams of suspected methamphetamine and approximately 110.6 gross grams of suspected Fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

49. On December 9, 2025, at approximately 11:40 a.m., SA Kazamias, TFO Kopatich, TFO Loberg, TFO Kropp, and TFO Ronsman (Brown County Task Force) met with CS 3 at the Milwaukee District Office (MDO). At approximately the same time, TFO Loberg searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results. Shortly thereafter, TFO Kropp provided CS 3 with $2,350.00 USC in Officially Advanced Funds (OAF). It should be noted that CS 3 was also provided with $1,250.00 USC in Brown County Task Force Funds by TFO Ronsman. In total, CS 3 was provided with $3,600.00 USC in buy funds. Additionally, CS 3 was provided with a live feed audio/video recording device.

50. At approximately 11:55 a.m., CS 3, under constant surveillance, departed the predetermined meet location and drove towards 320 N. 32nd Street, Milwaukee, Wisconsin. Shortly thereafter, at approximately 12:03 p.m., CS 3 arrived at the 320 N. 32nd Street address, exited his/her vehicle, and entered the camper located near the rear of the residence.

51. At approximately 12:08 p.m., CS 3 exited the camper. It should be noted that LEE and an unidentified female (hereafter referred to as UFM2) exited the camper and entered CS 3's vehicle and departed. While under constant surveillance, CS 3, LEE, and UFM2, travelled to a Family Dollar, Gas Station, and Checkers located near the intersection of N. 35th Street and W. Burleigh Street, Milwaukee, Wisconsin.

52. At approximately 12:40 p.m., CS 3, LEE, and UFM2 arrived at the residence located at 2614 W. Burleigh Street, Milwaukee, Wisconsin, and parked in the rear of the residence. Shortly thereafter, CS 3, LEE, and UFM2 exited the vehicle and entered the residence through the rear door.

53. At approximately 1:45 p.m., MPD PO Hermann, who was conducting surveillance at the Good Fellas Barber Shop at 4419 W. Center Street, reported that Pierre SMITH had arrived in a dark vehicle and exited with a large duffle bag that appeared to be heavy. PO Hermann reports seeing SMITH enter the passenger side of a black Maserati with the duffle bag. The Maserati then left the area. At approximately 1:52 p.m., the same black Maserati bearing WI Registration BAV3170 arrived and parked in the front of the 2614 W. Burleigh Street address. Subsequently LEE and CS 3 exited the residence, and LEE entered the rear seat of the Maserati. It should be noted that the CS 3 re-entered the residence.

54. At approximately 1:58 p.m., LEE exited the Maserati and entered the 2614 W. Burleigh residence, subsequently the Maserati departed the area.

55. At approximately 2:35 p.m., CS 3 and LEE exited the residence, and entered CS 3's vehicle, and departed the area. CS 3 and LEE subsequently arrived at the 320 N. 32nd Street address, exited the vehicle, and entered the camper located at the rear of the residence.

56. At approximately 4:35 p.m., CS 3 and LEE exited the camper, entered CS 3's vehicle, and departed the area. Subsequently, CS 3 and LEE arrived on South 20th Street near W. National Street in Milwaukee, Wisconsin.

57. At approximately 4:51 p.m., the Honda Odyssey bearing WI Registration BCD5755 (subject vehicle) arrived on South 20th Street and parked near CS 3 and CS 3's vehicle. LEE exited CS 3's vehicle and entered the Odyssey, then returned to CS 3's vehicle. It should be noted that by this time, the recording equipment provided to CS 3 was no longer recording and the remainder of CS 3's interactions with LEE were not recorded.

58. On December 4, 2025, the Honorable William E. Duffin, Magistrate Judge for the Eastern District of Wisconsin, authorized the installation and monitoring of a Global Positioning System (GPS) tracking device on the Honda Odyssey (subject vehicle). The device was installed shortly thereafter and case agents have monitored the subject vehicle's location since that time.

59. TFO Gregory reviewed GPS data for the subject vehicle. Through investigation, case agents know that GONZALEZ lives at 738 South 23rd Street. Case agents conducted physical surveillance of this residence from approximately 10:30AM to 3:30PM on December 9, 2025. Case agents observed the Subject Vehicle parked on the back parking slab for 738 South

23rd Street. The Subject Vehicle did not move from the location during the entirety of the surveillance episode. From reviewing the GPS data, the Subject Vehicle left 738 South 23rd Street at approximately 4:50PM. The Subject Vehicle drove directly to the 700 -block of South 20th Street. The Subject Vehicle was there for approximately four minutes and then returned to the area of 738 South 23rd Street. At approximately 5:01PM, the Subject Vehicle left the area of 738 South 23rd Street. The Subject Vehicle drove directly to the parking lot attached to 612 South 5th Street. This address is a restaurant named Catrina Café. The Subject Vehicle left shortly after and returned to the back parking slab for 738 South 23rd Street.

60. Based on my training and experience, the GPS data for the Subject Vehicle, and case agents' observations of the timing of the Subject Vehicle's arrival at CS 3's location, I believe that GONZALEZ departed his residence (738 S. 23rd Street) in the Subject Vehicle and met with LEE in the area of South 20th Street to supply LEE with methamphetamine for CS 3.

61. At approximately 4:58 p.m., CS 3 and LEE arrived back at the 320 N. 32nd Street residence. Shortly thereafter, LEE exited the vehicle, and CS 3 departed the area and drove to a pre-determined meet location. It should be noted that CS 3 was under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location.

62. At approximately 5:15 p.m., while at the predetermined meet location, TFO Kopatich retrieved the controlled substances from CS 3. Subsequently, SA Kazamias retrieved the live feed audio/video recording device from CS 3. CS 3 was searched for contraband with negative results. Additionally, TFO Ronsman searched CS 3's vehicle for money, contraband, and controlled substances, with negative results. When searched for money, CS 3 had $68.00 USC OAF remaining at the conclusion of the controlled buy.

63. A post-operational debrief was conducted with CS 3. During the debrief, CS 3 reported that:

64. CS 3 contacted LEE prior to CS 3 arriving in Milwaukee. Prior to CS 3's arrival, LEE had not made contact with any of the drug suppliers. LEE directed CS 3 to 320 N. 32nd Street where LEE was currently staying.

a. Upon CS 3's arrival, CS 3 entered a pop-up camper where LEE and a female known only as Marie, were located. Shortly after arriving, LEE told CS 3 that they need to go back to the house on Burleigh (I believe this to be 2614 W. Burleigh Street) where the "down" (purple fentanyl) would be delivered.

b. CS 3 and LEE were at the residence on Burleigh for approximately 30 minutes before LEE made a call to "Short Bust" (who I believe to Pierre SMITH) and requested two ounces of "down" (purple fentanyl) for CS 3.

c. When "Short Bust" (I believe to be SMITH) eventually arrived, CS 3 and LEE walked down the front stairs towards the front door. CS 3 handed LEE the money for the fentanyl while they were walking downstairs. CS 3 and LEE both exited the front door with the intent of both CS 3 and LEE getting into the vehicle that was parked on the street. CS 3 walked towards the vehicle and noted that the vehicle was full as it now contained LEE, "Short Bust" (I believe to be SMITH), and two other unknown persons. CS 3 went back into the residence. NOTE: The arrival of the black vehicle (Maserati), LEE and CS 3 exiting the front door, and CS 3 going back into residence, is consistent with the observations made by surveillance units on scene as well as video evidence obtained.

d. After CS 3 obtained the fentanyl from LEE, which LEE retrieved from his pants pocket while back in the residence, LEE began unpacking personal belongings that LEE had brought to the residence. A short time later, LEE said that they (meaning LEE and CS 3) would need to go back to the camper on N 32nd Street in order to obtain the requested meth. CS 3, LEE and the female (known to CS 3 only as Marie) got back into CS 3's vehicle and drove back to the camper.

e. While at the camper, another male and female arrived and met with LEE. LEE made a call to someone (according to CS 3 this call was most likely to the person I believe to be SMITH), and ordered another ounce of fentanyl for the male and female. At one point, LEE exited the camper and came back very quickly with the fentanyl.

f. While in the camper, LEE received a message from the "Mexican" (believed by CS 3 to be LEE's meth source) informing LEE that he had a flat tire and that LEE and CS 3 would have to come to him to get the meth. CS 3 and LEE were directed to an area on the south side of Milwaukee where CS 3 and LEE parked on the roadway. Shortly after they arrived, the meth source pulled up behind the vehicle containing CS 3 and LEE. LEE exited and got into the van that the meth source was operating. The van the meth source was driving then pulled in front of the car containing CS 3 and parked. LEE exited the van and got back into CS 3's vehicle with the meth in his coat pocket. LEE subsequently gave the meth to CS 3. CS 3 and LEE drove back to the camper where LEE was dropped off.

65. TFO Kopatich later reviewed the covertly recovered video made by CS 3 during the above-described transactions. Said video generally corroborates the information provided by CS 3 about what occurred during CS 3's purchase of fentanyl and methamphetamine from LEE.

Specifically, the video shows LEE and CS 3 walking down the stairs at 2614 W. Burleigh Street when the fentanyl source of supply (believed to be SMITH) arrives. Shortly thereafter, the video shows CS 3 and LEE going outside and LEE walking towards the Maserati, as witnessed by investigators on surveillance. The video then shows CS 3 going back into the residence and, a short time later, meeting with LEE. The video goes on to show LEE and CS 3 getting back into CS 3's vehicle and traveling to 320 N. 32nd Street. Shortly after arriving at 320 N. 32nd Street the audio and video battery failed.

66. Based on my training and experience, the investigation to date, CS 3's statements, and the corroboration of those statement provided by law enforcement surveillance, the GPS data for the subject vehicle, and the covertly recorded video of the December controlled buy, I believe that SMITH likely supplied LEE with fentanyl and that GONZALEZ likely supplied LEE with methamphetamine and that LEE provided both substances to CS 3.

**Brown County Fatal Overdose Investigation**

67. Through investigative deconfliction, case agents learned that LEE is a person of interest in a fatal controlled substance overdose in Brown County, Wisconsin. On October 23, 2025, law enforcement responded to a suspected overdose death of H.R.S. in the Township of New Denmark, Brown County, Wisconsin. Evidence located on scene combined with the prior history of the victim led investigators to believe that the death of H.R.S. was related to an overdose. Dr. Douglas of the Brown County Medical Examiner's Office listed the cause of death for H.R.S. as the toxic effects of fentanyl and methamphetamine.

68. Digital evidence and location data was obtained from multiple cell phone downloads as well as other investigatory techniques. Intelligence was gathered through several witness interviews. The combination of all of the evidence and intelligence that was gathered throughout this investigation shows that on October 22, 2025, J.J.G. and S.J.M. traveled to 320 N. 32nd Street in the City of Milwaukee where they obtained an unknown of amount of fentanyl that was purple in color from LEE AKA "Luffy." J.J.G. and S.J.M. then returned to Brown County with that fentanyl. Upon returning to Brown County they met with the victim, H.R.S. J.J.G. and S.J.M. distributed the fentanyl to the victim, H.R.S., who ingested that fentanyl, causing their death.

**Arrest of Kue LEE**

69. Case agents conducted a wanted check of LEE and found that he was currently wanted by the Wisconsin Department of Corrections for violating the terms and conditions of his extended supervision regarding Sheboygan County case# 2017CF000049 (Possession of methamphetamine) and Outagamie County case# 2021CF001259 (Burglary).

70. On December 11, 2025, members of law enforcement went to 320 North 32nd Street in an attempt to locate and arrest LEE. Officers knocked on the door for the residence and were allowed in to search for LEE. LEE was observed in the living room and taken into custody.

71. Officers conducted a search incident to arrest of LEE. Located in LEE's left pant pocket was a blue Samsung touchscreen smart phone. In LEE's front right pant pocket was a clear plastic bag that contained a purple powder that was suspected to be fentanyl. LEE was transported to the Milwaukee Secure Detention Facility for processing. TFO Kopatich later subjected the

suspected controlled substance to a presumptive field test that tests for the presence of fentanyl. The sample tested positive for the presence of fentanyl and had a total weight of 1.4 grams.

## <u>December 2025 Interview with CS 2</u>

72. In December 2025, case agents conducted a follow up debrief of CS 2. CS 2 stated that GONZALEZ still utilizes Target Cell Phone 1. CS 2 stated that GONZALEZ had been utilizing 262-900-2014 (a prior phone number that CS 2 knew GONZALEZ to have used before and during CS 2's present period of incarceration and herein referred to as "Prior Phone 1") for controlled substance transactions. CS 2 reported that CS 2 has personally spoken with GONZALEZ at Prior Phone 1 in the past. However, CS 2 stated that GONZALEZ no longer utilizes Prior Phone 1 and now utilizes a phone with phone number 414-294-9815 ("**Target Cell Phone 2"**). CS 2 obtained this information from an associate of CS 2 who, in turn, told CS 2 that they got the information from third party known by CS 2 to be acquainted with GONZALEZ. CS 2 does not have personal knowledge of GONZALEZ's use of **Target Cell Phone 2** and has never contacted GONZALEZ at that number.

73. In December 2025, your affiant reviewed subscriber information for **Target Cell Phone 2**. Subscriber results from Verizon listed an unknown subscriber.

74. During the in-person interview of CS 2 in December 2025, I showed CS 2 a WI DOT photograph of LEE. Without hesitation or prompting, CS 2 positively identified LEE as "Fire Boy," one of the individuals to whom CS 2 would sell methamphetamine that CS 2 obtained from GONZALEZ.

## Toll Analysis Between Prior Phone 1 and Target Cell Phone 2

75. TFO GREGORY found that the phone carrier for both Prior Phone 1 and **Target Cell Phone 2** is Verizon. TFO GREGORY served a subpoena upon Verizon to receive call detail records for each cell phone. Through analysis, TFO GREGORY found similarities in the call data for each phone.

76. An analysis of telephone records for **Target Cell Phone 2** from November 13, 2025 to December 14, 2025, revealed that **Target Cell Phone 2** was in contact with a total of 33 unique phone numbers. Out of those 33 unique phone numbers, 6 phones numbers (18%) also were in contact with Prior Phone 1. The analysis also showed a total number of 448 calls and text messages over **Target Cell Phone 2** during the time period analyzed. Out of those 448 calls and text messages over **Target Cell Phone 2**, 67 calls and text messages (14%) were with phones that were also in contact with Prior Phone 1.

77. Investigators note that **Target Cell Phone 2** had 293 contacts with 414-398-5706 which has been identified as belonging to Kue LEE through CS 3 and the controlled transactions. This amount of contacts accounts for 65.4% of all calls for **Target Cell Phone 2** during the time period analyzed. 414-398-5706 was not in contact with Prior Phone 1.

78. When investigators conducted a secondary analysis of the telephone records for **Target Cell Phone 2** from November 13, 2025 through December 14, 2025 with numbers *other* than 414-398-5706 (believed to be LEE), said analysis showed a total number of 155 calls and text messages over **Target Cell Phone 2**. Out of those 155 calls/messages, 67 calls and text messages (43%) were with phones that were also in contact with Prior Phone 1.

79. Based on the foregoing, TFO GREGORY believe that GONZALEZ is using **Target Cell Phone 2** as a replacement phone for Prior Phone 1. The last known outgoing contact of Prior Phone 1 occurred on November 24, 2025. It appears that Target Cell Phone 2 began being used on or about November 13, 2025.

80. Through CS 3's information, case agents learned that LEE's phone number is 414-398-5706. TFO GREGORY found the cell phone carrier for 414-398-5706 is AT&T. TFO GREGORY served AT&T a subpoena to receive call data records (CDR). Upon the receipt of those records, TFO GREGORY analyzed the data centered around the dates of the aforementioned controlled buys: November 11, 2025 and December 9, 2025.

81. From reviewing call data from November 19, 2025, LEE's device received a call from **Target Cell Phone 2** at 5:38PM and 5:39PM. From reviewing the reports surrounding the controlled purchase on November 19, 2025, case agents observed GONZALEZ's Honda Odyssey arrive in the area of North 31st Street and West St. Paul Avenue at approximately 5:40PM. Based upon the timing of the calls from **Target Cell Phone 2** to LEE's device and the arrival of the Honda Odyssey, TFO GREGORY believe that GONZALEZ used **Target Cell Phone 2** and contacted LEE to advise LEE that GONZALEZ was arriving to supply the methamphetamine.

82. From reviewing call data from December 9, 2025, TFO GREGORY learned that LEE's device and **Target Telephone 2** were in contact five different times that day. At 4:24PM and 4:29PM, LEE's device called **Target Telephone 2**. From reviewing the reports surrounding the controlled purchase on December 9, 2025, case agents observed LEE and CS 3 leave the area of North 31st Street and West St. Paul Avenue at approximately 4:35PM. They then immediately traveled to the area of South 20th Street and West National Avenue. Case agents then observed the

Honda Odyssey arrive at the location and observed LEE enter the vehicle. Based on the timing of the phone calls and case agents observing LEE and CS 3 leave to meet with the Honda Odyssey, TFO GREGORY believe that GONZALEZ used **Target Cell Phone 2** to speak with LEE to advise LEE where to meet GONZALEZ for GONZALEZ to supply the methamphetamine.

83. The data reviewed from LEE's cell phone is from October 30, 2025 to December 15, 2025. Between those dates, there were 465 contacts between LEE's device and **Target Cell Phone 2**. As previously stated, LEE was arrested on December 11, 2025. On December 14, 2025 and December 15, 2025, **Target Cell Phone 2** called LEE's device seven times. Based on this data, TFO GREGORY believe that GONZALEZ did not yet know that LEE was in custody.

84. TFO GREGORY reviewed further call detail records for **Target Cell Phone 2** and TFO GREGORY located two known associates of GONZALEZ in contact with **Target Cell Phone 2**. These associates are Frank MITCHEM and Krizia DAVILA-LOPEZ.

85. As previously detailed in this affidavit, MITCHEM is involved with the warehouse located at 3002 West Burleigh Street. **Target Cell Phone 2** was in contact with MITCHEM (262-353-0301) on 8 different occasions.

86. During the investigation, TFO GREGORY served subpoenas upon Wisconsin Energies to receive utility holder information. TFO GREGORY specifically asked for utility accounts that are under "Rehab Better Homes LLC" the LLC for which GONZALEZ is listed as a registered agent. TFO GREGORY found that there are two addresses with the utility holder being "Rehab Better Homes LLC". GONZALEZ is listed as the owner on the utility information and

DAVILA-LOPEZ is listed as the "secretary." **Target Cell Phone 2** was in contact with DAVILA-LOPEZ (262-751-2323) on 2 different occasions.

87. TFO GREGORY further analyzed call detail records data between Target Cell Phone 1 and **Target Cell Phone 2**. TFO GREGORY found one common contact between the two phone numbers. This phone number is 414-807-3988. Target Cell Phone 1 was in contact with x3988 on 35 occasions between September 6, 2025 and September 28, 2025. **Target Cell Phone 2** has one contact with x3988 on November 17, 2025. Through a CashApp search, TFO GREGORY found x3988 to be associated with a "Michael Terry." Michael Terry is not a person known to me or known to be otherwise involved in this investigation.

**Surveillance conducted on Miguel GONZALEZ on January 6, 2026**

88. On Tuesday, January 6, 2026, TFO Robert GREGORY, TFO Joseph ESQUEDA, and WI State Trooper Gareth SEDGBEER-WILLIAMS conducted surveillance on the residence of 738 S. 23rd Street in Milwaukee, Wisconsin. Case agents were aware that this residence was associated with GONZALEZ. During this surveillance, case agents were monitoring the PRTT installed on **Target Cell Phone 2,** which indicated that **Target Cell Phone 2** was in the general vicinity of 738 S. 23rd Street. This led case agents to believe that GONZALEZ was at the residence. TFO GREGORY, TFO ESQUEDA, and Trooper SEDGBEER-WILLIAMS positioned themselves around 738 S. 23rd Street for surveillance purposes. At approximately 12:10pm, a black Jeep Grand Cherokee SUV (the "Jeep") bearing Wisconsin Registration Plate No. BCC-9472 arrived and parked behind the residence. An unknown Hispanic male ("UHM") exited the driver seat of the Jeep and was allowed inside 738 S. 23rd Street via the rear door. At 12:51pm, UHM and GONZALEZ exited the rear door of 738 S. 23rd Street and walked to the Jeep. UHM

entered the driver seat while GONZALEZ entered the front passenger seat. The Jeep then left the area followed by case agents. During the follow of the Jeep, case agents monitored the data provided by the PRTT installed on **Target Cell Phone 2** which revealed that **Target Cell Phone 2's** approximate location was consistent with the path of travel of the Jeep leading me to conclude that that **Target Cell Phone 2** was likely inside the Jeep. Case agents briefly lost sight of the Jeep, but utilizing the data provided by the PRTT, case agents located the Jeep parked in the parking lot for the Wisconsin Department of Motor Vehicle (DMV) located at 2701 S. Chase Avenue. TFO GREGORY entered the DMV and observed UHM and GONZALEZ inside the DMV.

89. Based on surveillance coupled with the data provided by the PRTT installed on **Target Cell Phone 2**, I believe that GONZALEZ was in possession of **Target Cell Phone 2** when he entered the Jeep at his residence (738 S. 23rd Street) and drove to the WI DMV (2701 S. Chase Avenue).

90. Case agents reviewed the data provided by a subpoena served on Verizon regarding **Target Cell Phone 2**, which identified the cellular device as being an Apple iPhone 13 (128gb).

91. Furthermore, TFO GREGORY began to draft a message to **Target Cell Phone 2** utilizing an Apple product. When doing so, the numbers in the draft message turned blue. TFO GREGORY knows that this is significant because when two Apple brand products are communicating, the messages appear blue but when an Apple brand product is communicating with a non-Apple brand product, the messages are green. As such, I believe this further confirms that **Target Cell Phone 2** is an Apple-brand device and, therefore, I believe that the requested data for the **TARGET ACCOUNT** is maintained by Apple and will constitute evidence of the Target Offenses;

92. Based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact with their sources of controlled substances as well as customers and co-conspirators in the distribution of controlled substances. I have also found it incredibly common for drug traffickers to use their cellular telephones to communicate orally or via electronic message in “text” format with individuals with whom they purchase, trade, or otherwise negotiate to obtain illegal narcotics. I have also found it incredibly common for drug traffickers to take or cause to be taken photographs and other visual depictions (including videos) of themselves, their associates, and the illegal narcotics that they control, possess, buy and sell. I am aware that cellular telephones capture or otherwise store GPS location tracking/logging files, may provide additional evidence as to the target’s travels and may provide evidence as to the location where any alleged drug transaction(s) occurred or where quantities of controlled substances were obtained and/or trafficked. Similarly, location information may assist law enforcement with locating and identifying other subjects with whom the target was involved in the drug trade, including by identifying the place or places where said transaction(s) may have occurred. I am aware these text messages, photos, visual depictions (including videos), and location data is typically kept and maintained on their cellular devices and can be backed up to the user’s Apple iCloud account.

93. Based on my training and experience, I know that Apple device users frequently back up texts, photos, visual depictions (including videos), stored location tracking / logging data, etc. to iCloud (Apple’s cloud service) from their cellular devices (Apple iPhones & iPads such as **Target Cell Phone 2**), where data is stored and maintained under Apple’s control.

94. I am requesting the ability, pursuant to a search warrant, to retrieve the data from the iCloud account assigned to **Target Cell Phone 2**/**TARGET ACCOUNT** for the information and data detailed in Attachment B for the timeframe of January 1, 2025 to present. Given the information from the confidential sources detailed above, I believe that GONZALEZ has been involved in commission of the Target Offenses since at least that time and that evidence of his involvement is likely to be found in the back up for his telephone (**Target Cell Phone 2**/**TARGET ACCOUNT)**.

## BACKGROUND CONCERNING APPLE

95. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

96. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations,

spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

97. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email

addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

98. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

99. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

100. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial

number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

101. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

102. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

103. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

104. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

105. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

106. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

107. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**REQUEST FOR SEALING**

108. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## CONCLUSION

109. Based on the forgoing, I request that the Court issue the proposed search warrant.

110. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Apple ID and Apple iCloud account associated with the following information ("**TARGET ACCOUNT**"), that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

- Phone: 414-294-9815 (**Target Cell Phone 2**)
- Name: Miguel A. Gonzalez
- Date of birth: 11/19/1995

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by Apple Inc. ("Apple")

To the extent that the information described in Attachments A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, Apple is required to disclose the following information to the government for each account or identifier listed in Attachments A:

a. All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the accounts were created, the length of service, the IP address used to register the accounts, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the accounts (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all emails associated with the accounts from January 1, 2025 to the present, including stored or preserved copies of emails sent to and from the accounts (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d. The contents of all instant messages associated with the accounts from September 1, 2024 to the present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the accounts (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f. All activity, connection, and transactional logs for the accounts (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g. All records and information regarding locations where the accounts or devices associated with the accounts were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h. All records pertaining to the types of service used;

i. All records pertaining to communications between Apple and any person regarding the accounts, including contacts with support services and records of actions taken; and

j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, those violations involving **Miguel GONZALEZ** and others known and unknown, and occurring after January 1, 2025 to the present, including, for each account or identifier listed on Attachments A, information pertaining to the following matters:

(a) The sale, distribution, and possession with intent to distribute controlled substances, and launder the proceeds of drug trafficking;

(b) A conspiracy to distribute and possess with the intent to distribute controlled substances, including the existence, scope, acts in furtherance, and members of the conspiracy;

(c) Evidence about the source, sale, procurement, processing, manufacturing, shipping, or distribution of controlled substances, including customer lists, supplier lists, shipping information, and payments;

(d) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(e) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(g) The identity of the person(s) who communicated with the user ID about matters relating to drug trafficking, including records that help reveal their whereabouts.